[Cite as *In re A.U.*, 2024-Ohio-5464.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

In the Matters of:                 :       Case No.     24CA4079

A.U. (DOB: 2/14/07)            :       <u>DECISION AND</u>
M.U. (DOB: 10/14/08)                <u>JUDGMENT ENTRY</u>
S.U. (DOB: 6/6/10)             :
D.U. (DOB: 3/7/13)
M.U. (DOB: 10/7/14)           :       **RELEASED 11/18/2024**

_____

APPEARANCES:

Nathan D. Boone, Esq., Boone Law LLC, Dayton, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and S. Andrew Sturgill, Assistant Prosecuting Attorney, Portsmouth, Ohio, for appellee.

_____

Hess, J.

**{¶1}** The father of A.U. (DOB 2/14/07), M.U. (DOB 10/14/08), S.U. (DOB 6/6/10), D.U. (DOB 3/7/13), and M.U. (DOB 10/7/2014) appeals a judgment of the Scioto County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to the Scioto County Department of Job & Family Services, Children's Services Division (the "Agency"). Father presents one assignment of error asserting that the juvenile court's finding that a grant of permanent custody was in the best interest of the children was against the manifest weight of the evidence. For the reasons which follow, we overrule the assignment of error and affirm the juvenile court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

### A.  Initial Proceedings

**{¶2}**   This is the second case the Agency has initiated regarding the children.  On December 3, 2018, the Agency filed its first complaint alleging the children appeared to be neglected and dependent.  A caseworker averred that the Agency received information that the parents had been under the influence of drugs and arrested on drug possession charges. The caseworker went to the home where the children then lived with their parents and maternal grandparents and discovered it was too small for the number of people living there, the children were sleeping on the floor, there was no food for them in the house, and their grandparents appeared to be under the influence.  The grandparents said they were unable to care for the children, so the caseworker put them in shelter care. The children were adjudicated neglected and dependent. They were in the Agency's temporary custody from December 3, 2018, until August 12, 2020, when the juvenile court returned custody to the parents subject to protective supervision by the Agency.[1]   On December 30, 2021, the juvenile court terminated protective supervision.

**{¶3}**   On August 11, 2022, the Agency filed a second complaint alleging that the children appeared to be neglected and dependent and that A.U. also appeared to be an abused child. A caseworker averred that the previous day, the Agency received information that the parents were at juvenile court with the children for truancy matters. The caseworker met with the family, the parents submitted to drug testing, and they tested positive for methamphetamine and suboxone. The parents admitted they had a substance

---

[1] The permanent custody decision indicates the children were returned August 3, 2020. A witness testified to this effect, and the record indicates there was a hearing that day regarding the Agency's motion to return custody to the parents. However, the judgment entry ordering their return was not filed until August 12, 2020, so we have used that date.

abuse problem but stated that they were in treatment and had suboxone prescriptions from Brightview.  A.U. was five months pregnant, admitted to using pain pills, alcohol, and marijuana, and tested positive for suboxone. The parents indicated that they allowed A.U. to take the suboxone.

{¶4}    The day the Agency filed the second complaint, the juvenile court granted the Agency temporary emergency custody of the children. Following a probable cause hearing, the court continued temporary custody with the Agency. On October 24, 2022, based on the agreement of the parties, the court found the children were neglected and dependent and that A.U. was also an abused child as alleged in the complaint. The court entered a disposition of temporary custody with the Agency. The court also approved a case plan, which among other things, required that the parents complete a drug and alcohol assessment, follow all treatment provider recommendations, complete a parenting course, maintain a safe and clean home, and ensure the children attended school daily unless there was an emergency. Following an annual review hearing on August 8, 2023, the court found the Agency had made reasonable efforts to eliminate the continued removal of the children and that it was in the best interest of the children to continue temporary custody with the Agency.  On January 11, 2024, the Agency moved for permanent custody, and on April 3, 2024, the juvenile court conducted a hearing on the motion.

### B.  Permanent Custody Hearing

#### 1.  Testimony of Caseworker

{¶5}    An Agency caseworker testified that he became the children's primary caseworker in September 2023 but had worked with the family before then. When the

Agency became involved with the family in 2018, there were concerns about the parents using illegal substances, truancy, and homelessness. When the Agency became involved with the family again, the parents and A.U. were at a court hearing regarding A.U.'s truancy, and all three tested positive for illegal substances.

{¶6} The case plan addressed concerns regarding the parents' substance use, home conditions, and the substantial amount of school the children had missed. The caseworker testified that mother and father had drug and alcohol assessments at Ascend, which recommended partial hospitalization. Initially, Ascend did not have an available bed for father and referred him to intensive outpatient care. Both parents enrolled in intensive outpatient care. In November 2022, Ascend asked them to move to a higher level of care. They refused and stopped treatment at Ascend. Mother had "issues with being unable to have freedom and be with her husband." The parents next got assessments at Monarch, which recommended residential care. They refused it because they could not sleep in the same bed, and they did not enroll in services with Monarch.

{¶7} Mother was scheduled to meet with HopeSource but did not go because she turned herself in regarding a truancy matter and spent ten days in jail. At some point she sought outpatient treatment again, and the drug court she was enrolled in asked her to move to residential treatment. She did not go, and in December 2022, the drug court ordered her to complete treatment at The Counseling Center. Mother enrolled in residential care but left against staff advice two days later. The drug court sanctioned her and got her into Stepping Stones, but she only finished part of the program. She completed intensive inpatient services, which took about 2.5 months. She did not complete transitional living, leaving against staff advice in April 2023. In August 2023,

mother tested positive for methamphetamine, amphetamine, and suboxone at the annual review hearing.  Mother got an assessment at HopeSource but left inpatient treatment after six days.  On September 18, 2023, the caseworker told the parents the Agency might pursue permanent custody. The next day, mother enrolled in outpatient services with Brightview and reported her last usage was illegal suboxone the day before.

{¶8}   Near the end of December 2022, father enrolled in intensive outpatient and suboxone treatment with Brightview. He continued with services there, but in February 2023, he relapsed on methamphetamine. In August 2023, father tested positive for methamphetamine and amphetamine at the annual review.  He also tested positive for suboxone but had a prescription.

{¶9}   Father had not failed a drug test since the caseworker became the primary caseworker in September 2023.  The caseworker did not testify to mother failing any drug tests after her reported usage in September 2023.  However, the caseworker testified that the parents had not shown a consistent and maintainable behavior change. They had not followed professional recommendations, and they only got into and maintained treatment when there were discussions about the Agency making long-term plans for the children.

{¶10}  Housing has been an ongoing concern because the parents have a history of homelessness. They had been in their current home since August or September 2023. The caseworker had been there three times, most recently in March 2024, and testified that the home was "not the best" but had no active safety threats.

{¶11}  The caseworker testified that the parents completed a parenting course but had not demonstrated what they learned. The caseworker also testified that D.U. has diabetes, and the parents refused to go to an initial hospital appointment because only

one of them was allowed to attend due to hospital restrictions.  The Agency had no record of them getting diabetes training, but they had demonstrated interest in learning about the disease at visits. However, the caseworker also testified that the parents' visits with the children had been sporadic. They "started out fairly well" until December 2022, when visitation was suspended.  Visitation restarted in March 2023, once mother was back in treatment, but was suspended again in April 2023 because mother had an active warrant. Under normal Agency procedure, it was possible father could have had visits without her, but father never requested visits by himself. The caseworker acknowledged there was no record father was told he could have visits without mother, but the caseworker also testified that the parents wanted visits together. After visits resumed, father got upset when the caseworker initially separated the parents so he could evaluate them individually.  Father felt the caseworker was breaking up the family unit.

{¶12}  The caseworker testified that A.U. had "done awesome" in her current foster home and was raising her one-year old child there.  At the time of removal in 2022, A.U. had missed a year of school, and she then had to take time off for her child. There had been a high probability she would not graduate, but she was in a credit recovery program and set to graduate early.  M.U. (DOB 10/14/08) and S.U. were in the same foster home and were both doing well, getting good grades, and engaged in sports. M.U. (DOB 10/14/08) had a "very severe mental health history."  She self-reported at least one suicide attempt during the time she was with her parents and had suicide-related issues while in the Agency's custody.  However, she was in counseling and engaging in a lot of normal behaviors.  D.U. and M.U. (DOB 10/7/14) were in the same foster home and doing well. D.U. was getting good grades and was able to manage his diabetes with adult

supervision. M.U. (DOB 10/7/14) was a little shy but had "really come into her own" and gotten comfortable speaking to her foster parents. She was being evaluated for a possible learning disability.

{¶13} The caseworker testified that A.U. was 17 years old at the time of the permanent custody hearing, and her foster parents had discussed her staying with them until she "ages out" of the foster care system. However, they were also willing to adopt her. The caseworker testified that if the Agency received permanent custody, its goal for the children would be adoption.

### 2. Testimony of HopeSource Employee

{¶14} A HopeSource employee testified that in August 2023, mother had an assessment, and HopeSource recommended residential care. On admission, mother tested positive for amphetamine and suboxone without any valid prescriptions. After a few days, she left against staff advice. In November 2023, she had a second assessment and tested positive only for substances for which she had prescriptions. HopeSource did not recommend residential treatment at that time because mother reported that she was engaged in outpatient services with Brightview and following its recommendations, and mother was not engaged in illegal substance use.

### 3. Testimony of Attendance Officer

{¶15} An attendance officer testified that during the 2021-2022 school year, the family had transportation issues, and A.U. refused to go to school. A.U. had 777 hours of unexcused absences, and the other children had between 129 and 203 hours. In May 2022, a complaint was filed against the parents in juvenile court for contributing to the truancy of the children, except for maybe A.U., who "had her own charges and stuff going

on." At one point, father's counsel objected to the attendance officer's testimony on the ground that it was irrelevant because it dealt with pre-adjudication events. After some discussion, the juvenile court indicated that the Agency's counsel should wrap up the witness's testimony. The court did not state that it was striking any of the testimony. However, the court did not admit the children's attendance records into evidence.

4. Testimony of Court Appointed Special Advocate Volunteers and Director

{¶16} Two Court Appointed Special Advocate ("CASA") volunteers who served as guardians ad litem testified, along with the Scioto County CASA director. The first volunteer testified that the children's grades, social skills, and hygiene had improved in foster care. The first volunteer testified that A.U. was pregnant when the Agency got custody in the second case and that she has an addiction problem. The second volunteer testified that A.U. had struggled with staying in school and raising her child, but she had gone to parenting classes, and she was doing a good job balancing school and parenting but still struggling with addiction.

{¶17} The first volunteer testified that in March 2023, D.U. was diagnosed with Type 1 diabetes, had been doing a great job with his diagnosis, but needed a lot of adult supervision to manage his disease. The second volunteer testified that the hospital D.U. was sent to offered training on the disease to two people, one of whom had to be a foster parent. Mother was offered the second spot, but father came too, and when the hospital refused to let him in, the parents got angry and left.

{¶18} The CASAs recommended a grant of permanent custody to the Agency. The director testified there was major concern over the lack of case plan compliance regarding drug treatment. The director and first volunteer acknowledged the parents

passed drug tests the day of the permanent custody hearing, only testing positive for prescription suboxone. However, the director testified that the parents did not follow all recommendations, and the volunteers expressed concern about the parents' ability to maintain progress. The second volunteer emphasized how quickly after protective supervision ended in the first case that the parents relapsed, and A.U.'s situation deteriorated. He did not want to see the younger children have similar issues. The first volunteer also expressed concern over the amount of supervision D.U. needed to manage his "very complex disease." The director thought the parents had been evicted from two homes, and the director and first volunteer expressed concern about the parents' home conditions but later admitted they never visited the current home.

{¶19} The juvenile court took judicial notice of the court file, which includes the April 2, 2024 CASA report. Among other things, the report indicates the children collectively missed 432.22 school hours while in the Agency's care. The report also indicates the oldest three children wanted to return to their parents, the youngest two children wanted to stay in their current placements and be adopted, but all the children had "changed their wishes on numerous occasions" during the proceedings.

### C. Permanent Custody Decision

{¶20} The juvenile court terminated the parental rights of the parents and granted the Agency permanent custody of the children. The juvenile court found that the children had been in the Agency's custody for over 12 of the last 22 months and that it was in their best interest to grant permanent custody to the Agency. Among other things, the court took note of the parents' years of drug issues, the parents' failure to complete "recommended drug counseling components," the prior removal, the "extraordinary time"

the children had been in the Agency's custody and foster care, and "the failure of the parents to prioritize the extraordinary health issue of D.U."

## II. ASSIGNMENT OF ERROR

**{¶21}** Father presents one assignment of error:

The Juvenile Court erred in finding that there was clear and convincing evidence to support a finding that it was in the best interest of Father's minor children, A.U., M.U., S.U., D.U., and M.U.2 to be placed in the permanent custody of [the Agency] when such a finding was against the manifest weight of the evidence.

## III. LAW AND ANALYSIS

### A. Statutory Framework

**{¶22}** Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody to a public children services agency if the court determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) apply, and (2) it is in the best interest of the child. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶23}** R.C. 2151.414(B)(1)(d) applies when a child has "been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period . . . ." The juvenile court found the children had been in the Agency's temporary custody for the requisite time, and father does not dispute

that finding.  Therefore, we must affirm the permanent custody award unless the juvenile court erred in its best interest determination.

**{¶24}**  R.C. 2151.414(D)(1) states:

In determining the best interest of a child . . . the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

### B.  Standard of Review

**{¶25}**  "[T]he sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties."  *In re Z.C.*, 2023-Ohio-4703, ¶ 11.  The Supreme Court of Ohio has explained:

Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are " 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus.  We have stated that "sufficiency is a test of adequacy," *Thompkins* at 386, while weight of the evidence " 'is not

a question of mathematics, but depends on its *effect in inducing belief* "
(emphasis sic), *id.* at 387, quoting *Black's Law Dictionary* 1594 (6th
Ed.1990). "Whether the evidence is legally sufficient to sustain a verdict is
a question of law." *Id.* at 386. "When applying a sufficiency-of-the-evidence
standard, a court of appeals should affirm a trial court when " 'the evidence
is legally sufficient to support the . . . verdict as a matter of law." ' " *Bryan-
Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, 874 N.E.2d
1198, ¶ 3, quoting *Thompkins* at 386, quoting *Black's* at 1433.

But "even if a trial court judgment is sustained by sufficient evidence,
an appellate court may nevertheless conclude that the judgment is against
the manifest weight of the evidence." *Eastley* at ¶ 12. When reviewing for
manifest weight, the appellate court must weigh the evidence and all
reasonable inferences, consider the credibility of the witnesses, and
determine whether, in resolving conflicts in the evidence, the finder of fact
clearly lost its way and created such a manifest miscarriage of justice that
the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20. "In
weighing the evidence, the court of appeals must always be mindful of the
presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying
rationale of giving deference to the findings of the trial court rests with the
knowledge that the trial judge is best able to view the witnesses and observe
their demeanor, gestures and voice inflections, and use these observations
in weighing the credibility of the proffered testimony." *Seasons Coal Co.,
Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). " 'If the
evidence is susceptible of more than one construction, the reviewing court
is bound to give it that interpretation which is consistent with the verdict and
judgment, most favorable to sustaining the verdict and judgment.' " *Id.* at fn.
3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-
192 (1978).

*Id.* at ¶ 13-14.

{¶26} The assignment of error raises a manifest weight challenge to the juvenile

court's best interest finding.  In his argument, father also claims there is insufficient

evidence to support that finding, "but we are charged with deciding assignments of error,

not mere arguments." *State v. Fannon*, 2018-Ohio-5242, ¶ 135 (4th Dist.), citing *State v.

Owens*, 2016-Ohio-176, ¶ 59 (4th Dist.).  However, we observe that father's failure to

raise a sufficiency challenge in his assignment of error has no practical impact in this case

because while ""sufficiency and manifest weight are different legal concepts, a finding

that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment.'"'" *In re H.R.P.T.*, 2021-Ohio-2285, ¶ 53, fn. 3 (4th Dist.), quoting *In re L.B.*, 2020-Ohio-3045, ¶ 29 (10th Dist.), quoting *In re C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.). As we explain below, the juvenile court's judgment is supported by the manifest weight of the evidence.

### C. Father's Position

**{¶27}** Father contends that the juvenile court's decision is against the manifest weight of the evidence because the Agency failed to prove by clear and convincing evidence that it was in the best interest of the children to grant permanent custody to it. Father maintains that he completed parenting classes, obtained safe and secure housing, completed at least two drug and alcohol assessments, engaged in drug counseling, and maintained sobriety for about eight months before the permanent custody hearing. Father asserts that he could not demonstrate what he learned in parenting classes because he was unfairly denied visitation due to mother's conduct. He suggests that he could not be expected to know that he was able to request visits without mother. Father also asserts that his current housing was acceptable to the only witness who personally observed the residence.

**{¶28}** Father claims it is unclear whether the attendance officer's testimony was admitted, but the juvenile court never struck the testimony. Father asserts that "[i]rrespective of whether it was admitted," the testimony is irrelevant because the focus of a permanent custody hearing is post-adjudication/disposition improvements or lack thereof by the parents. He asserts that the children's truancy during the 2021-2022 school year and related contributing charges occurred before the second complaint was filed,

and the Agency has had custody of the children since then, so he was given "no opportunity to rectify" the issue. We observe that at one point in his appellate brief, father claims the juvenile court used "evidence admitted in abuse of" its discretion, but he did not present an assignment of error challenging the admission of any evidence. Thus, we interpret his argument about the admission officer's testimony as pertaining to the weight, rather than the admissibility, of that evidence.

{¶29} Father notes the children expressed interest in returning to his care "at varying points." He also notes that A.U.'s foster parents had considered letting A.U. stay with them until she "aged-out of the system." He asserts this "cannot be said to be in the best interest of a child." In addition, father claims there was "testimony regarding suicide attempts and continued poor school attendance" while the children were in Agency custody, which "further exemplifies the fact that the decision to grant permanent custody was against the manifest weight of the evidence."

### D.  Best Interest of the Children

#### 1.  Interactions and Interrelationships of the Children

{¶30} Evidence suggests the children have a good relationship with their foster parents but also love their parents.

#### 2.  Wishes of the Children

{¶31} The children's wishes changed several times during the proceedings. As of the permanent custody hearing, the three oldest children wanted to return to their parents. The two youngest children wanted to remain in their current foster placement.

### 3. Custodial History

**{¶32}** The children were in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1) states that for purposes of that provision, "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." In this case, the earlier date is 60 days after the removal of the children, i.e., October 10, 2022. The children were still in the Agency's temporary custody at the time of the permanent custody hearing on April 3, 2024.

### 4. Legally Secure Permanent Placement

**{¶33}** The Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). Although the parents had a home without any active safety hazards at the time of the permanent custody hearing, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶34}** Evidence supports the juvenile court's finding that a legally secure permanent placement cannot be achieved without a grant of permanent custody to the Agency. The children were in the Agency's custody from December 3, 2018, to August 12, 2020, under the protective supervision of the Agency from August 12, 2020, until December 30, 2021, and in the Agency's custody again from August 11, 2022, until the

permanent custody hearing on April 3, 2024.  Thus, as of the permanent custody hearing, the Agency had custody of the children for 40 of the last 64 months, and the juvenile court had open cases on the children for 56 of the last 64 months.  As the juvenile court pointed out, there was enough case plan compliance for the children to be returned to the parents in the first case, but around eight months after protective supervision ended, "the same problems were back again and worse" because not only were the parents using drugs again, but  A.U. was pregnant, engaged in drug use—some of which was facilitated by her parents, and not attending school.

**{¶35}**  There was some case plan compliance in this case, but the parents failed to follow all drug treatment recommendations.  Father suggests this failure is immaterial because he achieved the goal of sobriety before the permanent custody hearing, but as the juvenile court explained:

> A major component of the case plan of the parents is get professional substance counseling to first get drug-free, to learn skills to remain drug-free, and that will lead to long-term behavioral changes.
>
> . . .
>
> Any user of methamphetamines must not only stop using but the user must be taught coping skills and tools that can cause a change of behavior. Without following expert counseling help for a change of behavior and sobriety coping skills, the relapse possibility is greatly increased.  In these circumstances, reunification becomes risky and experimental. It was already tried in 2021 and the parents miserably bombed that reunification.
>
> It is noteworthy that the parents have remained a couple throughout all their personal and legal problems.  While it is admirable for parents to stick together through tough times, both being "addicts" adds a layer of recovery complexity.  One parent relapsing can easily cause a negative influence on the other.  That's why following and completing professional counseling plans (including inpatient/residential care) [is] so important.

The 2022 case plan clearly addresses the sobriety goal and relapse prevention. The parents were to get counseling and follow any and all recommendations. It was not up to the parents to create their own plan.

The parents initially complied and went for initial assessments with several different agencies. They, being all counseling agencies, recommended both parents get and complete inpatient/residential treatment.

Both parents either refused to go to inpatient/residential treatment or quickly and prematurely checked themselves out. The parent did this with several different agencies.

. . . [H]indsight shows that the children were returned home too soon the last time. Even after that case being opened from 2018 to 2021, the parents weren't strong enough. Months later, in 2022, the long-term addiction and behavioral problems of the parents were too powerful for them to manage. In 2022, the parent's [sic] addiction and consequences had again devasted the parents and their children.

A few recent months of passing drug screens, without the benefit of completion of professionally recommended inpatient/residential care, is not enough case plan compliance for this Court to further keep this case open.

And as the juvenile court noted, the parents had "disappointingly never been trained how to take care of D.U.'s daily special health needs."

**{¶36}** There is evidence that the children have made improvements in foster care and that if granted permanent custody, the Agency's goal would be to secure adoptive placements for them. The suggestion that the Agency has neglected the children because one child has had suicide-related issues, and the children have missed school in Agency custody is not well-taken. The child with suicide-related issues is engaged in counseling. The children did miss school in the Agency's custody, but it is possible absences may have been excused, such as time A.U. took off for her child, and the children's education progressed in Agency custody despite the missed hours.

### 5.  Factors in R.C. 2151.414(E)(7) to (E)(11)

**{¶37}** The juvenile court did not find R.C. 2151.414(E)(7) to (E)(11) applied. Nothing in the parties' briefs or record indicates they are applicable to this case.

### 6.  Conclusion

**{¶38}** After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the juvenile court's determinations, we conclude that in resolving evidentiary conflicts, the juvenile court did not clearly lose its way or create such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.  The juvenile court's best interest finding is not against the manifest weight of the evidence.  Accordingly, we overrule the sole assignment of error and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
      Michael D. Hess, Judge




## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**